**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| JONATHAN AYALA,<br><br>       Plaintiff,<br><br>       - against -<br><br>WEXFORD HEALTH SOURCES, INC.; ALISHA TAFOYA LUCERO, NM SECRETARY FOR DEPARTMENT OF CORRECTIONS, in her individual capacity; DAVID SELVAGE, NMCD HEALTH SERVICES ADMINISTRATOR, in his individual capacity; ORION STRADFORD, NMCD BUREAU CHIEF, in his individual capacity; MICHAEL HILDENBRANDT, WEXFORD DIRECTOR OF OPERATIONS, in his individual capacity; TOMMIE SALINAS, WEXFORD HEALTH SERVICES ADMINISTRATOR OF GCCF, in his individual capacity; DR. MURRAY YOUNG, WEXFORD REGIONAL MEDICAL DIRECTOR, in his individual capacity; KATHY ARMIJO, WEXFORD REGIONAL MANAGER OF GCCF, in her individual capacity; JAMES GONZALES, WEXFORD MEDICAL DIRECTOR OF GCCF, in his individual capacity; ARTURO LEON, WEXFORD MEDICAL DIRECTOR OF GCCF, in his individual capacity; SARAH CARTWRIGHT, WEXFORD REGIONAL DIRECTOR OF NURSING, in her individual capacity; LYNNSEY VIGIL, WEXFORD UTILIZATION MANAGEMENT COORDINATOR, in their individual capacity;<br><br>       Defendants. | No. _____<br><br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY**<br>**TRIAL** |

       Plaintiff Jonathan Ayala ("Mr. Ayala" or "Plaintiff"), by his attorneys, Collins & Collins,

P.C.; Prison Lights, Inc.; and Guebert Gentile & Piazza P.C., and pursuant to 42 U.S.C. §§ 1983

and 1988, and 28 U.S.C. §§ 2201 and 2202, brings this action (the "Complaint") to redress

violations of Mr. Ayala's Eighth and Fourteenth Amendment rights under the United States

Constitution, and alleges, based on personal knowledge as to his own experiences and otherwise on information and belief, as follows:

## PRELIMINARY STATEMENT

1.      The New Mexico Corrections Department ("NMCD") and Wexford Health Sources, Inc. ("Wexford") acting through their respective employees, staff, agents and assigns named above in their individual capacities, knew that Mr. Ayala was at a high risk of developing endocarditis and that he was suffering from increasing and debilitating pain that was not ameliorated over time or through pain medication. Yet, Defendants deliberately and recklessly ignored an emergent infection and Mr. Ayala's high risk of endocarditis, which caused him to spend 70 days in the hospital, undergo heart/lung surgery, and nearly die.

2.      Mr. Ayala's injuries, near-death experience, and prolonged pain and suffering were, in part, the result of Wexford's widespread pattern and practice of failing to provide constitutionally adequate medical care and effectively denying patients access to medical care. His injuries and suffering were also caused, in part, by NMCD's longstanding pattern and practice of responding with deliberate indifference to the failures of its medical contractors to provide constitutionally adequate medical care to NMCD prisoners.

3.      The actions and inactions of Defendants violated Mr. Ayala's rights secured by 42 U.S.C. § 1983 under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

4.      This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

5.      Subject matter jurisdiction in conferred by 28 U.S.C. § 1331.

6.    This Court has personal jurisdiction over each of the entity and individual Defendants because, upon information and belief, all Defendants are domiciled in the State of New Mexico and/or have substantial contacts in the State of New Mexico and purposefully availed themselves of conducting business in New Mexico.

7.    Venue is proper here under 28 U.S.C. § 1391(b)(2), because, upon information and belief, a majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

8.    Plaintiff Jonathan Ayala is a resident of the United States presently domiciled in Grants, New Mexico. During the events giving rise to this action, Mr. Ayala was physically located in New Mexico. During all relevant times, he was in the custody of the NMCD. Until his subsequent transfer to private hospitals to receive medical care, he was housed at Guadalupe County Correctional Facility ("GCCF") in Santa Rosa, New Mexico. GCCF is a state-run facility managed and operated by New Mexico State agency NMCD and existing under the laws of the State of New Mexico. GCCF is operated in accordance with NMCD rules, policies, and procedures. NMCD, through its employees, staff, agents, and assigns, who are named in their individual capacities, is responsible for the policies, practices, supervision, implementation, and conduct of all GCCF matters and for the appointment, training, supervision, and conduct of all GCCF personnel, including the individual Defendants specifically named herein.

9.    Defendant Wexford is a foreign corporation registered to do business in New Mexico. Wexford, by the terms of the Professional Services Contract, #20-770-1300-1200-0043 ("PSC"), was contracted by NMCD for the purposes of providing medical care to prisoners in the

3

NMCD prison system, including Mr. Ayala. Upon information and belief, the term of the PSC began on or about October 19, 2019 and was in effect at all times relevant to this Complaint.

10.     Under the PSC, Wexford was acting as the apparent and actual agent, servant, and contractor of NMCD and was responsible for the care, health, safety, and proper medical treatment of all prisoners in NMCD's facilities, including Mr. Ayala. Pursuant to the PSC, NMCD adopted Wexford's policies, practices, habits, customs, procedures, training, and supervision as its own, and Wexford adopted NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own. Wexford acted by and through its employees, staff, agents and assigns who are named in their individual capacities.

11.     Defendant Alisha Tafoya Lucero served as the New Mexico Secretary for the Department of Corrections at all times relevant to this Complaint. As the Secretary for the Department of Corrections, Ms. Lucero oversaw prison operations, including NMCD's nondelegable duty to provide a safe environment at its facilities, including GCCF, and to ensure that prisoners have access to adequate health care. She was an agent of NMCD, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

12.     Defendant David Selvage served as the Health Services Administrator ("HSA") for NMCD at all times relevant to this Complaint. As HAS for NMCD, Mr. Selvage maintained direct clinical oversight over independent medical contractors, and was responsible for ensuring that NMCD contractors provided adequate care to NMCD prisoners, including those at GCCF and specifically, Mr. Ayala. He was an agent of NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

13.     Defendant Orion Stradford served as the NMCD Bureau Chief at all times relevant to this Complaint. As NMCD Bureau Chief, Mr. Stradford was responsible for monitoring the work of independent contractors, including Wexford, and acted as NMCD's supervisor over its independent contractors. He was an agent of NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

14.     Defendant Michael Hildenbrandt served as Wexford's Director of Operations at all times relevant to this Complaint. As the Director of Operations, Mr. Hildenbrandt was responsible for overseeing Wexford's operations within New Mexico prisons and ensuring that Wexford met its duty to provide constitutionally adequate medical care to prisoners within the NMCD facilities in which it operated. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

15.     Defendant Tommie Salinas served as Wexford's Health Services Administrator of GCCF at all times relevant to this Complaint. As the HSA, Mr. Salinas maintained direct clinical oversight of Wexford staff, agents, and independent contractors and was responsible for ensuring that all such individuals provided adequate care to NMCD prisoners, including those at GCCF and specifically Mr. Ayala. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

16.     Defendant Dr. Murray Young served as Wexford's Regional Medical Director for New Mexico's region at all times relevant to this Complaint. As the Regional Medical Director, Dr. Young was responsible for the care, health, safety and proper medical treatment of Mr. Ayala. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

17.     Defendant Kathy Armijo served as Wexford's Regional Manager of GCCF at all times relevant to this Complaint. As the Regional Manager of GCCF, Ms. Armijo was responsible for the care, health, safety and proper medical treatment of Mr. Ayala. She was an agent of Wexford and NMCD, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

18.     Defendant James Gonzales served as one of Wexford's two Medical Directors of GCCF at all times relevant to this Complaint. As a Medical Director, Mr. Gonzales was responsible for the care, health, safety and proper medical treatment of Mr. Ayala. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

19.     Defendant Arturo Leon served as one of Wexford's two Medical Directors of GCCF at all times relevant to this Complaint. As a Medical Director, Mr. Arturo was responsible for the care, health, safety and proper medical treatment of Mr. Ayala. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

20.     Defendant Sarah Cartwright served as Wexford's Regional Director of Nursing for New Mexico's region at all times relevant to this Complaint. As the Regional Director of Nursing, Ms. Cartwright was responsible for the care, health, safety and proper medical treatment of Mr. Ayala. She was an agent of Wexford and NMCD, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

21.     Defendant Lynnsey Vigil served as Wexford's Utilization Management Coordinator at all times relevant to this Complaint. As the Utilization Management Coordinator,

they participated in the utilization management process and were responsible for the care, health, safety and proper medical treatment of Mr. Ayala. They were an agent of Wexford and NMCD, acting within the scope of their employment at all times relevant to this lawsuit. They are sued herein in their individual capacity.

22.     At all times relevant to this Complaint, each of the abovenamed Defendants was an employee and/or agent of a New Mexico state-run entity or a private medical service responsible for treating State prisoners, a task which was ultimately the responsibility of the State. Accordingly, all Defendants were acting under color of state law at all relevant times.

## FACTUAL BACKGROUND

I.     **MR. AYALA COMPLAINED OF SEVERE PAIN AND NEARLY LOST HIS LIFE DUE TO MULTIORGAN FAILURE BEFORE DEFENDANTS FINALLY TRANSFERRED HIM TO A HOSPITAL FOR EMERGENCY MEDICAL CARE.**

23.     At the time that Mr. Ayala began complaining of his medical injuries, he was 26 years old and imprisoned by NMCD at GCCF, where Wexford was contracted to provide medical services to prisoners.

24.     While incarcerated at GCCF, Mr. Ayala had a history of intravenous drug abuse that made him susceptible to infections, including endocarditis, and this history was known to Wexford and NMCD staff, including the individual Defendants, through Mr. Ayala's prison file and regular conversations amongst Wexford medical staff and the individual Defendants.

25.     On January 26, 2021, Mr. Ayala told Wexford medical staff (a term which includes nurses, medical unit assistants, and other staff who are medically-trained and/or worked within the medical areas of GCCF) that he had a fever for the past three days, that he could not eat, and that he had been vomiting during this time. He also stated that he had developed hives the day prior,

on January 25, 2021. He informed medical staff that he had used Suboxone on January 24, 2021 and that, afterward, red spots started to appear on his body. Prison medical staff noted "illicit drug use" in his medical file.

26.     In response to Mr. Ayala's three-day fever, and despite noting that Mr. Ayala displayed a toxic appearance, Wexford medical staff only gave him an anti-nausea medication and acetaminophen (Tylenol).

27.     On January 27, 2021, Mr. Ayala told Wexford medical staff that he was unable to urinate. At the time, Mr. Ayala's physical state was noticeably deteriorating. In response, nurses merely diagnosed him with a viral and urinary tract infection. Wexford medical staff just prescribed Mr. Ayala more anti-nausea medication and acetaminophen, along with Benadryl and an antibiotic (Bactrim). Wexford medical staff conducted a urine culture, but no further testing was performed upon receiving the results, and Mr. Ayala's minimal treatment was not altered or increased in any way.

28.     On January 28, 2021, Mr. Ayala complained to Wexford medical staff of body aches, continued nausea, and headaches. Although he had been prescribed antibiotics, it was noted that these antibiotics had not been administered, so he was given his missed morning dose in the afternoon.

29.     On January 29, 2021, Wexford medical staff conducted a blood test on Mr. Ayala, yet his medications and treatment were not altered, and he was not referred to a doctor.

30.     By January 31, 2021, Mr. Ayala could no longer walk, and he was helped into a wheelchair by a fellow prisoner. Mr. Ayala complained to Wexford medical staff that he was weak, his back felt like it would give out, and he was experiencing diarrhea, vomiting, spinal pain, and

sharp neck pain. He told Wexford medical staff that if he moved too fast, he would lose his breath. In response, Wexford medical staff merely continued the same minimal treatment that had been proven ineffective over the past six days.

31.     On February 1, 2021, Mr. Ayala was seen again by Wexford medical staff for an infection on the side of his neck, possibly due to intravenous illicit drug use. Wexford medical staff noted that he had an increased heart rate (tachycardic state) and acute hepatitis. In response, Mr. Ayala was merely prescribed a different antibiotic, more acetaminophen, and Clonidine to lower his heart rate and blood pressure. He also received an EKG test, which displayed abnormal results. Still, he was not referred to or seen by a doctor.

32.     On February 2, 2021, Mr. Ayala was still unable to walk when he visited Wexford medical staff. He was wheeled down to Wexford's medical unit in GCCF by a nurse. Mr. Ayala reiterated his extreme pain to Wexford medical staff. In response, he was given Tylenol and returned to his cell.

33.     On February 3, 2021 at approximately 4:30 AM, Mr. Ayala visited Wexford medical staff with complaints of a fever and pain in his upper legs that had been growing for approximately two weeks. Again, he was prescribed Aspirin and an antacid (Magnesium Oxide) and told to consume more electrolytes. Wexford medical staff wrongly diagnosed him as merely having a drug induced fever.

34.     Later in the day, Mr. Ayala was finally seen by a doctor, upon information and belief, and the doctor immediately sent him to the local emergency room at Guadalupe County Hospital in Santa Rosa, New Mexico.

35.     Upon information and belief, Mr. Ayala was never seen by a doctor during the

entire time that he was complaining of a high fever, aches, vomiting, and the inability to eat from at least January 26, 2021 to February 3, 2021. During this time, Mr. Ayala was never seen by any medical provider capable of competently evaluating, diagnosing, and/or treating Mr. Ayala's symptoms and conditions.

36.     Additionally, from January 26, 2021 to February 3, 2021, Mr. Ayala was denied critical medical care despite persistent and repeated complaints of symptoms that are clear indicators of endocarditis, especially when combined with Mr. Ayala's known risk factors for endocarditis.

37.     Rather than properly diagnose and treat Mr. Ayala, Wexford medical staff simply took his vitals and provided Tylenol and antibiotics that had already been proven ineffective before sending Mr. Ayala back to his cell in an increasingly severe and debilitating state. Wexford medical staff ignored Mr. Ayala's pain and deteriorating health even after the point at which Mr. Ayala required a wheelchair.

38.     Wexford medical staff overseeing GCCF acted and failed to act with reckless disregard and deliberate indifference to Mr. Ayala's serious medical needs, including through the following: (a) failing to obtain a diagnosis by a medical doctor and instead relying on triage and diagnoses by nurses unqualified to diagnose endocarditis, (b) failing to refer Mr. Ayala to an outside medical provider for proper diagnosis and treatment despite knowing that staff at GCCF lacked the diagnostic capability concerning endocarditis, (c) failing to develop, employ, and follow appropriate policies and procedures with regard to the assessment, treatment, and management of endocarditis, and (d) failing to provide Mr. Ayala with necessary and proper pain management.

39.     Both Wexford Medical Directors of GCCF, Defendants James Gonzales and Arturo

Leon, failed to see Mr. Ayala for weeks as his health rapidly deteriorated. James Gonzales and Arturo Leon showed a complete lack of interest or concern for Mr. Ayala's health and safety despite the fact that he was displaying clear signs of endocarditis, and endocarditis is common in NMCD facilities. Both James Gonzales and Arturo Leon displayed deliberate indifference to Mr. Ayala's critical, life-threatening infection.

40. Additionally, upon information and belief, on-site medical personnel, including medical doctors and the Director of Nursing, cannot make a referral to an outside medical provider without prior corporate approval through the utilization management review process, regardless of the diagnostic and/or treatment limitations that exist at any given NMCD facility, including GCCF. Because of this policy, the referral of Mr. Ayala for emergency care was not made until it was too late to avoid severe and permanent harm.

41. Upon information and belief, Defendants Dr. Murray Young, Lynnsey Vigil, Kathy Armijo, James Gonzales, and Arturo Leon determined when an NMCD prisoner at GCCF could be transferred to an outside medical provider. Upon information and belief, in making this determination, they utilized an automated software that was modeled on insurance industry standards for approval of referrals. Nurses input data into the software and referrals could be automatically refused based upon the software's own automated process, with no regard for constitutional standards concerning prisoner medical care.

42. Upon information and belief, this process was used in Mr. Ayala's case, which caused him to be denied access to constitutionally adequate medical care.

**II.   MR. AYALA WAS DIAGNOSED WITH MULTIORGAN FAILURE, UNDERWENT HEART/LUNG SURGERY, AND WAS HOSPITALIZED FOR OVER TWO MONTHS BECAUSE OF DEFENDANTS' DELIBERATE INDIFFERENCE TO HIS LIFE-THREATENING CONDITION.**

43.     At approximately 3:30 PM on February 3, 2021, Mr. Ayala arrived at the Emergency Room of the Guadalupe County Hospital presenting noted symptoms of weakness, fever, fatigue, and excessive heart rate (tachycardia). Hospital staff conducted an EKG to confirm that Mr. Ayala had an abnormally high heart rate.

44.     After their initial examination of Mr. Ayala, hospital staff quickly identified "suspected endocarditis" as a likely cause of Mr. Ayala's injuries given Mr. Ayala's known drug use history and presentation of a fever of unknown origin for approximately one week and an elevated white blood cell count.

45.     Almost immediately, hospital staff were able to diagnose Mr. Ayala with multiorgan failure, including acute renal failure and acute heart failure. They immediately transferred him to a higher level of care, as his dire status was patently obvious.

46.     Around 8:30 PM on February 3, 2021, Mr. Ayala was emergency air-lifted to the University of New Mexico Hospital ("UNMH") Emergency Room so that he could be treated by medical staff specializing in cardiology and nephrology, specialized services which were not available at Guadalupe County Hospital.

47.     At approximately 11:00 PM on February 3, 2021, UNMH medical staff confirmed Mr. Ayala's diagnoses of acute renal failure and also diagnosed him with septic emboli of the lung, which occurs when a blood vessel is obstructed and requires critical care.

48.     On February 5, 2021, UNMH confirmed that Mr. Ayala had been suffering from severe sepsis (life-threatening, overwhelming infection).

49.     From February 3, 2021, through April 13, 2021—for seventy days—Mr. Ayala remained in the hospital and underwent countless medical procedures, including cardiothoracic

surgery (heart/lung surgery), in order to prevent his death from multiorgan failure.

50.    In light of these facts, it is clear that, together, NMCD, Wexford, and their agents: Failed to properly monitor Mr. Ayala's medical conditions, failed to perform adequate physical examinations and evaluations of test results, failed to refer Mr. Ayala for higher/specialty care in a timely manner, and caused significant and inexcusable delay in the diagnosis of Mr. Ayala's severe sepsis and multiorgan failure.

51.    Overall, the medical care provided to Mr. Ayala under Wexford's and NMCD's care was so grossly deficient as to amount to no medical care at all.

### III.    WEXFORD DEMONSTRATED A PERSISTENT AND WIDESPREAD PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF PRISONER PATIENTS UNDER ITS CARE, AND THIS PRACTICE WAS THE MOVING FORCE BEHIND MR. AYALA'S INJURIES.

52.    Wexford maintained various widespread patterns and practices which violated Mr. Ayala's constitutional rights and contributed to his severe injuries, including: (1) failing to report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions; (2) delaying or denying patient referrals to necessary emergency or other offsite medical services; (3) severely understaffing its medical and mental health facilities; (4) failing to provide adequate medical documentation or communicate changes in patient conditions to the appropriate correctional officers and/or medical or mental health staff; and (5) failing adequately to hire, retain, and train and supervise its employees and agents on procedures necessary to protect patients' health.

53.    In essence, Wexford's medical care of NMCD prisoners effectively amounted to no medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a

façade . . . [and] so cursory as to amount to no treatment at all") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by . . . proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.").

    A.    <u>Wexford had a pattern and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions, and of delaying or denying patients access to critical off-site medical services, which were contributing factors to Mr. Ayala's injuries.</u>

54.    Wexford failed to report, diagnose, and treat the warning signs of serious conditions for many other patients in circumstances similar to those of Mr. Ayala. These failures are reflected in the following non-exhaustive list of cases:

- In *Jessica Melendrez v. NMCD et al.*, No. D-101-CV-2022-01177 (N.M. 1st Dist. Ct.), Wexford failed to diagnose and treat a patient's emergent infection and failed to refer the patient to an outside provider in a timely manner, resulting in a long-term ear infection that caused permanent hearing loss.

- In *Vincent Martin v. Wexford et al.*, No. D-101-CV-2021-02252 (N.M. 1st Dist. Ct.), Wexford failed to diagnose and treat emergent infection and failed to refer the patient to an outside provider in a timely manner, resulting in osteomyelitis, discitis with partial vertebral collapse, and severe sepsis.

- In *Brandon Wagner v. NMCD et al.*, No. D-101-CV-2020-01058 (N.M. 1st Dist. Ct.), Wexford refused to timely report, diagnose, and treat signs of Hepatitis-C, which caused the patient substantial pain for over a year and put his life in jeopardy.

- In *Gerry Armbruster v. Wexford et al.*, No. 16-CV-00544 (S.D. Ill.), Wexford failed to timely report, diagnose, and treat signs of spinal injury, which resulted in the patient's needlessly extended suffering and diagnosis of severe spinal cord compression requiring emergency surgery.

- In *Sharon Bost v. Wexford et al.*, No. 15-CV-03278 (D. Md.), Wexford failed to timely report, diagnose, and treat signs of stroke, which resulted in the patient's death from excessive brain swelling before Wexford medical personnel were even able to arrive at the facility.

- In *Andre Mauldin v. Saleh Obaisi et al.*, No. 15-CV-02106 (N.D. Ill.), Wexford failed to timely report, diagnose, and treat signs of severe knee injury, which resulted in major structural damage to the patient's knee, including a torn ACL and other major ligament tears requiring immediate surgery.

- In *Antonio Hunter v. Ill. Dept. of Corr., et al.,* No. 21-CV-00271 (S.D. Ill.), Wexford refused to timely report, diagnose, and treat signs of renal prolapse and denied the patient's clear need for a surgery consultation, which resulted in life-threatening excessive bleeding.

- In *Patrick Pursley v. Tarry Williams, et al.*, No. 15-CV-04313 (N.D. Ill.), Wexford refused to timely report, diagnose, and treat signs of severe respiratory infection and a broken rib for over a year, which caused the patient to heal improperly and endure over a year of severe pain and difficulty breathing.

55. The preceding cases and others illustrate Wexford's persistent refusal to refer prisoner patients to third-party medical providers for the provision of a higher level of care unavailable through Wexford within NMCD's facilities.

56. Upon information and belief, Wexford's widespread failure to refer prisoners for off-site medical care was, in large part, financially motivated, as Wexford was contractually relieved from paying for the hospital costs of any prisoner who was hospitalized for more than 24 hours. Evidently, this fee structure incentivized Wexford to refrain from referring prisoners for off-site care unless and until their injuries were so severe that they would likely require hospitalization lasting more than 24 hours.

57. The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practices of improper reporting, diagnosing, monitoring, examining, treating, and referring prisoner patients for off-site services:

- In 2004, Florida's Office of Program Policy Analysis and Government Accountability ("OPPAGA") found that "Wexford kept costs down by compromising the care of its inmates," and that one of "the most pressing problems" was Wexford's "postponement of specialty clinic visits." Some of Wexford's former employees allege that NMCD's

monetary savings "came at too high a cost."[1]

- According to the accounts of numerous prior Wexford employees in New Mexico, in 2006, Wexford repeatedly refused to grant chronically ill prisoners critical, off-site specialty care and had "systemic problems in administering prescription medicine" to prisoners. Because of these issues and others, Wexford lost its multimillion-dollar contract with New Mexico "[a]fter two troubled years of administering health care." Around this time, Wexford also lost its contracts with Wyoming and Florida for similar reasons.[2]

- In 2006, the NMCD spokeswoman at the time admitted publicly: "Wexford has not met its contractual obligations to the Department, and that's something we can't ignore. We have to do something about it." Similarly, a former Wexford employee from Hobbs, New Mexico stated: "It is my sense that Wexford doesn't care what sort of facility they run. Everything is run on a bare-bones budget. They're in it to make money."[3]

- Also around 2006, multiple former Wexford employees in New Mexico reported that "to save money, [Wexford] failed to send sick inmates off-site to hospitals expeditiously." One former Wexford nurse from New Mexico reported that other private prison medical providers gave medical staff discretion to decide when prisoners required specialized off-site medical attention, whereas Wexford "consistently denied approval." She found this practice to be "really disturbing" given that prisoners were "suffering all the time" and their lives were potentially at risk. Similarly, a former Wexford administrative assistant in New Mexico noted that their "inmates stayed in pain a lot," particularly due to the long wait times for chronically ill patients waiting for off-site medical treatment. A third former Wexford employee noted that Wexford staff "had to wait until an inmate was practically dying before [they] could send them off for X-rays."[4]

- Additionally, in 2006, former Wexford employees in New Mexico "reported that the mentally ill were cut off psychotropic medicine for cheaper, less effective drugs, those who needed off-site specialty care were consistently denied referrals, and some were even denied prescription medication for significant periods of time against their doctors' recommendations," and "[s]taff complained of a systemic lack of medical supplies including protective equipment for treating infectious diseases like MRSA."[5]

- In 2007, a New Mexico Legislative Finance Committee audit found "gaping holes" in Wexford's delivery of healthcare, and one lawmaker compared the level of care to "torture" and "murder." Additionally, it was found that diabetic patients were not receiving a drug

---

[1] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[2] https://www.sfreporter.com/2006/12/13/sfr-exclusive-wexford-under-fire/
[3] Id.
[4] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[5] https://www.acluaz.org/sites/default/files/documents/Wexford One-Pager_1.pdf

meant to fight off infections as required by national standards for chronic illness care.[6]

- In 2009, Wexford was audited by Clark County, Washington and found to have "systematically failed to comply with the many complex undertakings included in its contract with the county."[7]

- In 2012, the Arizona Department of Corrections wrote a letter to Wexford's director titled "Written Cure Notification," detailing 20 "significant areas of non-compliance and required corrective action within 90 days pursuant to the contract." These deficiencies included, among others: (1) inappropriate discontinuation/change of medication, (2) inconsistent non-formulary medication approval process, (3) inconsistent or contradictory medication refill and/or return procedures, (4) inability to readily identify specific groups of prisoners or chronic conditions based upon medications prescribed (*e.g.,* diabetes), (5) quantitative decreases in routine institutional care consisting of a backlog of chart reviews, untimely handling of Health Needs Requests, and backlog/cancellation of outside specialty consultations, and (6) unresponsive approaches to corrections department inquiries on patient information and the prisoner grievance process.[8]

- Also in 2012, the Arizona Department of Corrections disciplined and fined Wexford for failing to provide a mentally ill prisoner with his prescribed psychotropic medication for an entire month before he hanged himself in the prison. The state noted Wexford's "significant non-compliance," and "lack of urgency" in correcting medication problems.[9]

- Around 2013, a dental care expert for a class of Arizona prisoner plaintiffs found that Wexford provided systemic deficiencies in the provision of dental care, including (1) insufficient dental staffing, (2) inadequate processes for triaging prisoners requiring dental treatment, (3) inappropriate treatment of pain, (4) a de facto "extraction only" policy for teeth, and (5) inadequate treatment of chewing difficulty.[10]

- In 2014, a prisoner spent five months begging Wexford staff for a medical diagnosis, treatment, and referral to an off-site specialist who could provide necessary care, but Wexford repeatedly failed to fulfill any of these requests, so the prisoner required emergency spinal cord surgery. This Wexford doctor "missed critical symptoms and misdiagnosed common conditions."[11]

---

[6] https://www.pressreader.com/usa/albuquerque-journal/20070524/283330402891567
[7] https://www.acluaz.org/sites/default/files/documents/Wexford%20One-Pager_1.pdf
[8] *Parsons v. Ryan*, 289 F.R.D. 513, 517 (D. Ariz. 2013) (identifying these deficiencies in all ten prisons); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz).
[9] https://www.prisonlegalnews.org/news/2014/oct/2/arizona-fines-wexford-10000-neglect-hepatitis-c-exposure/
[10] *Parsons v. Ryan*, 289 F.R.D. 513, 519 (D. Ariz. 2013) (noting that three plaintiffs waited between 85 and 516 days to receive treatment for identified dental needs and one plaintiff had not had a tooth cleaning in 6.5 years); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz).
[11] https://theappeal.org/why-prisoners-get-the-doctors-no-one-else-wants/

- Also in 2014, Wexford continually refused to give two other prisoners necessary, standard antibiotics, which caused these prisoners to develop severe infections that had to be surgically removed because Wexford doctors simply refused to treat these patients.[12]

- Moreover, a 2014 court-appointed panel of medical experts published a report finding that Wexford's care of at least two prisoners was "'extremely problematic,' and involved 'egregious' lapses in care" involving failures to properly test, report, and treat that "could 'only be construed as deliberate indifference.'"[13]

- In 2015, Wexford agreed to pay the family of a prisoner who died in Illinois $800,000 after its doctors failed to diagnose and treat him for colon cancer, and he died as a result. Wexford failed to properly refer the prisoner for off-site diagnosis and treatment for two years even though he had lost 42 pounds, had nausea, frequent vomiting, and back pain, could not urinate or defecate, had blood in his stool, and continued to insist that he was in excruciating pain and seriously ill.[14]

- In 2017, Wexford exhibited chronic care backlogs in at least six Indiana prisons. In one of these facilities, 100 prisoners had missed their required 90-day medical appointments for chronic care services.[15]

- In 2018, a U.S. District Court Judge in Illinois found that Wexford's services continued to fall short of constitutional standards, stating that "it [was] clear [that] mentally ill inmates continue[d] to suffer;" the providers remained "deliberately indifferent" to the needs of mentally ill prisoners; and "[t]he Court cannot allow this to continue."[16]

- Also in 2018, a report from court-appointed experts found that 12 of the 33 deaths under Wexford's care that they studied were preventable, another seven might have been preventable, and no conclusions could be reached about five cases because these deaths were not adequately documented.[17]

- In 2019 or 2020, a former Illinois prisoner was awarded an $11 million jury verdict against Wexford after the jury found that Wexford deliberately delayed his medical tests and treatment for advanced kidney cancer. Around this time, a young mentally ill prisoner received no medical attention from Wexford after he was seen swallowing two plastic sporks, lost 54 pounds, and complained of abdominal pain. Eventually, he died due to esophageal perforation. Also around this time, a court-appointed expert reviewed death records from 2016 and 2017, while prisoners were under Wexford's care, and found that

---

[12] *Id.*
[13] *Id.*
[14] https://www.illinoistimes.com/springfield/six-figure-settlement-in-prison%20lawsuit/Content?oid=11437278
[15] https://www.alreporter.com/2017/11/15/report-shows-wexford-health-services-failing-requirements-indiana/
[16] https://theappeal.org/no-shower-wearing-diapers-laying-there-for-so-long/
[17] https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400

about 58% of these deaths were preventable or possibly preventable.[18]

- In 2020, a court-appointed monitor in Illinois found that one Wexford nurse was asked to check on a prisoner who was unresponsive and drooling, but she waited so long to do so that, when she finally arrived at his cell, he was already receiving CPR.[19]

- The 2020 court-appointed monitor in Illinois also found that Wexford would not allow prisoners to see off-site medical specialists unless approved by Wexford employees in Pennsylvania who discussed cases without the benefit of charts or examining patients. One prisoner's surgery to remove a mass in his shoulder was delayed for over a year, and according to the monitor, this delay could have jeopardized his life. Similarly, a reported delay in the eye surgery of another prisoner could have resulted in his permanent loss of vision. The monitor noted that delays of dental care have lasted nearly two years, and the median wait time for dentures or fillings was nine months.[20]

- In 2021, a prisoner committed suicide a few days after improperly being taken off suicide watch, when Wexford knew that he had expressed an intent to kill himself, and Wexford failed to take appropriate measures to report, diagnose, examine, treat, monitor, and protect him.[21]

58.     Upon information and belief, on-site Wexford medical providers are unable to refer prisoner patients for off-site diagnostic testing and services. Instead, Wexford's "utilization review" process requires Wexford corporate approval of prisoners' off-site services. Upon information and belief, Wexford has a pattern and practice of routinely denying off-site medical referrals for prisoners and, in doing, so, frequently overrides the clinical advice of its on-site medical providers.

59.     The preceding cases and articles, among others, also establish that Wexford and NMCD were on notice of these widespread unconstitutional practices prior to Mr. Ayala's injuries and thereby knew that additional safeguards should have been put in place to address patients'

---

[18] https://www.chicagobusiness.com/health-care/illinois-comes-short-another-area-prison-health-care
[19] https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400
[20] *Id.*
[21] https://www.indystar.com/story/news/investigations/2021/11/30/lawsuit-mentally-ill-man-should-not-have-died-indiana-prison/8797782002/

signs of serious medical and mental health conditions.

60.     Accordingly, it can be readily inferred that Wexford intentionally failed to report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety. And NMCD intentionally failed to provide proper supervision and oversight of these practices despite the risk known to it.

61.     Wexford's widespread practice of failing to report, diagnose, and treat the warning signs of serious medical and mental health conditions shares a close factual relationship with the events in Mr. Ayala's case, and accordingly, the widespread practice was the moving force behind his injuries and near-death experiences.

62.     Significantly, Wexford personnel failed to conduct diagnostic and physical examinations multiple times in Mr. Ayala's case alone, which establishes a pattern and practice of insufficient reporting, diagnoses, and treatment of serious medical conditions.

63.     As such, Wexford's policy and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions caused Mr. Ayala's injuries.

B.     <u>Wexford had a pattern and practice of severely understaffing its medical and mental health facilities, which was a moving force behind Mr. Ayala's injuries.</u>

64.     Wexford's chronic understaffing of medical positions has been continually publicized and made known to both Wexford and NMCD as early as the late 1990s.

65.     The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practice of understaffing its medical personnel, as well as the tragic consequences to prisoners due to this understaffing:

- In the late 1990s, the U.S. Justice Department investigated Wexford's medical services in Wyoming prisons and criticized Wexford's staffing levels, noting that its inadequate staffing and other inadequacies "created conditions that violated inmates' constitutional

rights." Shortly after this report was published, Wexford lost its contract with Wyoming.[22]

- Similarly, in 2004, Florida's OPPAGA found that Wexford had a pattern of insufficient staffing in Florida's prisons.[23]

- In 2005, the NMCD Corrections Secretary at the time confirmed that Wexford proposed paying New Mexico approximately $35,000 "to address state concerns about a shortage of hours worked by Wexford personnel."[24]

- In 2006, the Santa Fe Reporter noted that it repeatedly published accounts from former Wexford employees focusing on the "dangerously low medical staffing levels at the nine correctional facilities where Wexford operate[d]" in New Mexico.[25]

- In 2006, one former Wexford dentist located in Hobbs, New Mexico stated that prisoners were suffering because the backlog to receive dental treatment was so massive, and the facilities were so understaffed that prisoners sometimes waited up to six weeks to receive important dental care. Some prisoners had to resort to pulling their own teeth after months of waiting, saying they just could not stand the pain any longer. The former Wexford dentist called Wexford "grossly understaffed and disorganized."[26]

- Also in 2006, former Wexford employees in New Mexico reported that Wexford regularly "canceled inmates' medical appointments because of staff shortages." Similarly, according to a former Wexford administrative assistant in New Mexico, "[s]taffing was so short that a Wexford administrator once authorized a lab technician to start an intravenous flow on an inmate, something he was not legally licensed to do."[27]

- In 2006, one former Wexford nurse from New Mexico stated that, as soon as Wexford took over medical services in New Mexico prisons, "things changed dramatically." One of the most notable changes was an approximate 50% reduction in the nursing staff, resulting in cancelled medical appointments due to staffing shortages.[28]

- In 2007, a New Mexico Legislative Finance Committee audit found that Wexford was very understaffed. For example, no medical staff were on duty at the Santa Fe prison when one expert visited in March 2007. The audit also found that nurses often spent time doing clerical duties because there were so few clerical workers. "A common complaint against Wexford was that it left positions vacant to save money."[29]

---

[22] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[23] *Id.*
[24] *Id.*
[25] https://www.sfreporter.com/2006/12/13/sfr-exclusive-wexford-under-fire/
[26] *Id.*
[27] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[28] *Id.*
[29] https://www.pressreader.com/usa/albuquerque-journal/20070524/283330402891567

- In 2012, Arizona's "Written Cure Notification" letter to Wexford's director also identified the following significant areas of Wexford's non-compliance related to staffing: (1) inadequate staffing levels in multiple program areas at multiple locations, (2) staffing levels creating inappropriate scheduling gaps in on-site medical coverage, (3) staffing levels forcing existing staff to work excessive hours, creating fatigue risks, and (4) quantitative decrease in routine institutional care: backlog of prescription medication expiration review.[30]

- Also in 2012, the mental health contract monitor for Arizona corrections wrote and circulated an internal memo reporting that: "Wexford's current level of psychiatry [was] grossly insufficient to meet [its] contractual requirement. Further, this staffing level is so limited that patient safety and orderly operation of [Arizona corrections] facilities may be significantly compromised. . . . Wexford currently has 14.85 psychiatry [full-time employees] allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications. Wexford now employs a total of 5.95 [full-time] psychiatry providers (approximately 33% of their allocation) [leaving] 8.9 [full time employee slots] vacant (leaving a vacancy rate of 66%)."[31]

- In late 2012, Wexford's own review of its services in Arizona prisons concluded that "of 762 budgeted full time employee positions, only 567 positions had been filled. It also revealed that, for higher-level providers, such as physicians, psychiatrists, dentists, nurse practitioners, and management-level health care staff, the overall vacancy rate across ADC facilities exceeded 50%." Around the same time, a survey of the quality of healthcare in Arizona prisons concluded that insufficient coverage was "reaching a critical state for both routine visits and chronic care follow-ups."[32]

- In 2017, records obtained concerning Wexford's services in Indiana prisons revealed that Wexford failed to meet "required staffing levels, particularly in the area of mental and behavioral health." Such shortfalls led to "backlogs in providing care, especially with regard to prisoners with chronic medical conditions including diabetes and HIV."[33]

- In 2018, a U.S. District Court Judge in Illinois found that Wexford had "systemic and gross deficiencies in the staffing of mental health providers."[34]

- In 2020, a court-appointed monitor in Illinois found that Wexford was drastically understaffing its prison medical facilities, and that 357 new positions, mostly for nurses,

---

[30] *Parsons v. Ryan*, 289 F.R.D. 513, 517 (D. Ariz. 2013) (identifying these deficiencies in all ten prisons); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz.).

[31] *Parsons v. Ryan*, 289 F.R.D. 513, 519 (D. Ariz. 2013); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz.).

[32] *Parsons v. Ryan*, 754 F.3d 657, 668-69 (9th Cir. 2014); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz.).

[33] https://www.alreporter.com/2017/11/15/report-shows-wexford-health-services-failing-requirements-indiana/

[34] https://theappeal.org/no-shower-wearing-diapers-laying-there-for-so-long/

were needed to comply with a consent decree meant to ensure constitutionally adequate medical care in Illinois prisons.[35]

66.    Upon information and belief, Mr. Ayala was unable to receive adequate medical treatment due, in part, to the severe shortage of healthcare providers at the prison. Numerous important health protocols were violated, and critical assessments and evaluations foregone. It was this lack of medical care and contract oversight that exacerbated Mr. Ayala's medical issues and eventually caused his injuries.

67.    Simply put, Mr. Ayala received little to no healthcare services largely because there were very few healthcare providers working in NMCD prisons in the months leading up to his injuries.

68.    Through Wexford's well-documented history of understaffing, and the investigative reporting published on the dangerous consequences of Wexford's staffing shortages, Wexford and NMCD were put on notice that this severe understaffing was substantially certain to cause constitutional violations regarding patients' medical treatment, yet they both chose to disregard that risk and, for decades, continued to display a pattern and practice of severe shortages in medical staff and mental healthcare providers.

69.    In this way, Wexford and NMCD acted with deliberate indifference to prisoners' healthcare needs. *See, e.g., Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (finding deliberate indifference to prisoners' healthcare needs where "gross deficiencies in staffing" and procedures cause the prisoner population to be "effectively denied access to adequate medical care").

---

[35] https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400

C.     Wexford also had a pattern and practice of failing to provide adequate medical documentation and failing to communicate changes in patient conditions, both of which contributed to Mr. Ayala's injuries.

70.     Wexford failed to provide adequate medical documentation and failed to communicate changes in patient conditions for many other patients in circumstances similar to those of Mr. Ayala.

71.     The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practice of providing inadequate medical documentation and failing to communicate changes in patient conditions:

- In 2004, Florida's OPPAGA found that Wexford's pattern of insufficient record keeping was one of "the most pressing problems" of its non-compliance with its contract in Florida prisons.[36]

- In 2005, Wexford's regional medical director for New Mexico's prisons found that Wexford nurses repeatedly failed to accurately document test results or to communicate those results. According to this director, these repeated failures could constitute a "falsification of [ ] testing." When the director notified Wexford, it "never fully addressed her concerns and placed her on leave when she pressed the matter." According to the Santa Fe Reporter, this account is similar to the accounts of five other former Wexford employees interviewed by the Reporter.[37]

- In 2006, a former Wexford nurse from New Mexico reported that "she observed Wexford administrators at Central [prison in New Mexico] altering inmates' medical records." According to her, "[t]hey were hiding mistakes they'd made." A former Wexford administrative assistance from Hobbs, New Mexico voiced these same concerns.[38]

-  Also in 2006, another former Wexford nurse from New Mexico reported that "Wexford's record keeping was so desultory, it was difficult to keep track of which inmate was getting which medicine." When this nurse repeatedly informed Wexford's chief health services administrator in New Mexico, the nurse was "roundly ignored."[39]

- Similarly, in 2006, a third former Wexford nurse from New Mexico stated that Wexford had "glaring errors" in how it kept medical charts, so that prisoners received the wrong

---

[36] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[37] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[38] *Id.*
[39] *Id.*

medicine and even the wrong dosages. This nurse quit his employment with Wexford after one month as Wexford's director of nursing, ending his 24-year career as a prison nurse because, among other things, he was concerned about losing his license due to the inadequate medical care that Wexford was providing its patients in New Mexico prisons.[40]

▪ In 2007, Wexford failed to issue timely reports on 14 prisoner deaths in New Mexico correctional facilities.[41]

▪ In 2012, Arizona's "Written Cure Notification" letter to Wexford's director also identified the following significant areas of Wexford's non-compliance related to improper documentation and communication of prisoners' conditions: (1) incorrect and incomplete pharmacy prescriptions, (2) inadequate pharmacy reports, (3) inconsistent documentation of Medication Administration Records, (4) inadequate/untimely communication between field staff, corporate staff, and the corrections department, and (5) lack of responsiveness and/or lack of awareness of incident urgency and reporting requirements.[42]

▪ Also in 2012, Arizona disciplined Wexford for, among other things, failing to timely report one of its nurses who exposed 103 prisoners to hepatitis C through contaminated insulin injections as a result of improperly mixed vials. Wexford did not notify health officials of these prisoners' hepatitis C exposure until eight days later. According to the state, "Wexford failed to follow nursing protocols, mismanaged documents, and did not adequately notify authorities of the contamination." Moving forward, the state directed Wexford to "properly distribute and document medication for prisoners, show some urgency, and communicate better when problems arise." Shortly thereafter, Arizona and Wexford "abruptly decided to cancel the company's contract." According to the legal director of the ACLU of Arizona at the time, there was "no question that over the past year Wexford [had] been providing abysmal care to Arizona prisoners with serious medical and mental health needs."[43]

72.    Likewise, in Mr. Ayala's case, Wexford failed to provide adequate medical documentation and failed to communicate important changes in Mr. Ayala's medical condition to providers who had the ability to appropriately treat his condition.

73.    The preceding articles and cases, among other reports, establish that Wexford and NMCD were on notice of these widespread unconstitutional practices prior to Mr. Ayala's injuries

---

[40] *Id.*
[41] https://www.pressreader.com/usa/albuquerque-journal/20070524/283330402891567
[42] *Parsons v. Ryan*, 289 F.R.D. 513, 517 (D. Ariz. 2013) (identifying these deficiencies in all ten prisons)
[43] https://www.prisonlegalnews.org/news/2014/oct/2/arizona-fines-wexford-10000-neglect-hepatitis-c-exposure/

and thereby knew that additional safeguards should have been put in place to address the inadequate medical documentation and communication of changes in patient conditions.

74.     Accordingly, it can be readily inferred that Wexford intentionally failed to adequately document patient conditions and failed to adequately communicate changes in those conditions despite the known and obvious risk to patient safety.

75.     Wexford's widespread practice of failing to provide adequate medical documentation and communicate changes in patient conditions shares a close factual relationship with the events in Mr. Ayala's case, and accordingly, the widespread practice was the moving force behind his injuries.

76.     Because Wexford personnel did not adequately document or otherwise communicate Mr. Ayala's rapidly deteriorating medical condition to the appropriate personnel, he was not provided with the medical treatment that he clearly needed, which caused him to sustain life-threatening injuries.

77.     Accordingly, Wexford's policy and practice of providing inadequate medical documentation and failing to communicate changes in patient conditions to appropriate personnel caused Mr. Ayala's injuries.

78.     NMCD intentionally failed to provide proper supervision and oversight of these practices despite the risk known to it. In fact, NMCD was complicit in failing to keep adequate prisoner medical records. In NMCD's contract with its prior medical provider from June 2016, it stated:

> "In order to provide constitutionally adequate medical care to patient-inmates and to help determine the strategy for completing NMCD's Clinical Data Repository (CDR) and pharmacy systems, a review of electronic health record options has determined that the best strategy moving forward is to procure an Electronic Health

Record (EHR) software solution."

79.     Yet—six years later—NMCD has still not implemented an EHR system despite its continuing recognition that an EHR system is necessary for constitutionally adequate healthcare, as reaffirmed in the PSC, which states: "In order to provide constitutionally adequate medical care to inmates, NMCD has determined that it must procure an electronic health record (EHR) software solution." Upon information and belief, no efforts are underway to identify and implement an EHR system.

80.     An EHR system would significantly curtail medical recordkeeping abuses and deficiencies, including the destruction, loss, and alteration of medical records. An EHR system would also create greater accountability for both NMCD and its medical contractors, including Wexford. Many medical record files provided by NMCD have missing medical records, oftentimes at critical periods just prior to a prisoner's hospitalization. Additionally, notes and signatures of non-electric notes are often illegible, and medical staff neglect to put notes in charts. Even Wexford managerial level medical personnel are unable to read the notes and signatures in prisoner medical records. For example, Defendant Young testified in another case to his inability to read numerous medical notes and signatures. Yet, Defendant Young took no corrective action to address this issue.

81.     NMCD has been on notice of the medical recordkeeping abuses and inadequacies in its facilities for years, and it has chosen not to implement an EHR system to curb those abuses and deficiencies. Therefore, NMCD has also demonstrated its own persistent pattern and practice of providing constitutionally deficient medical documentation, which was another moving force behind Mr. Ayala's injuries.

D.   Wexford failed to adequately hire, retain, train, and supervise its personnel despite knowing that such practices were necessary to protect patient health, and this failure was a moving force behind Mr. Ayala's injuries.

82.    Wexford's extensive and decades-long patterns of understaffing, delaying off-site medical treatment, poorly documenting prisoner medical appointments, failing to communicate important changes in patients' medical conditions, and generally choosing cost-cutting measures over patients' well-being evinces Wexford's utter failure to properly hire, retain, train and supervise its employees and agents.

83.    The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practice of inadequately hiring, retaining, training, and supervising its staff, along with the dire consequences of these failures to properly hire, retain, train, and supervise:

- In 2006, a former Wexford nurse from New Mexico reported that "[i]nmates were hoarding doses [of medication] and using them as currency because nursing staff were not adequately controlling medication dosage." According to this nurse, "[t]he nurses who did this were exceeding the scope of their licenses, breaking the law and jeopardizing patient safety." Wexford supervisors did nothing to stop this practice.[44]

- Around 2007, Washington, Mississippi, and New Mexico all reported issues with Wexford's "lack of training and oversight for medical employees, and promotion of workers into positions where they were not properly licensed." In Mississippi, medical care was provided to prisoners by Wexford employees without proper credentials. And in New Mexico, "mental health counselors were operating without state licenses."[45]

- In 2014, federal court-appointed medical experts published a report of their findings that Wexford "hired 'underqualified' physicians and failed to provide appropriate supervision and oversight," which "resulted in at least 36 deaths between January 2013 and June 2014 and two deaths in 2010 that the team deemed 'problematic.'"[46]

- In 2017, another federal court-appointed panel of medical experts found that Wexford still "failed to hire properly credentialed physicians, which increased the risk of harm to patients

---

[44] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[45] https://www.acluaz.org/sites/default/files/documents/Wexford One-Pager_1.pdf
[46] https://theappeal.org/why-prisoners-get-the-doctors-no-one-else-wants/

and led to nearly a dozen preventable deaths from 2016 to 2017." Alarmingly, two of the doctors found to provide inadequate care remained on Wexford's staff after these experts' findings had been circulated.[47]

- Also in 2017, the Mississippi Attorney General filed a RICO lawsuit against Wexford and others, claiming that Mississippi had been "defrauded through a pattern of bribery, kickbacks, misrepresentations, fraud, concealment, money laundering and other wrongful conduct," through which Wexford and others "benefited by stealing from taxpayers."[48]

- In 2020, a court-appointed monitor in Illinois found that "three Wexford doctors without proper credentials, including two whose licenses [were] on probation, have such serious issues with qualifications and bad care that they should not be employed in prisons." Wexford did not inform the state about these disciplinary histories, and according to the monitor, the problematic doctors were not being adequately monitored. When asked, prison authorities would not disclose whether these doctors were still retained as Wexford employees after the findings were published.[49]

- The 2020 court-appointed monitor in Illinois also found that Wexford retained and did not discipline or document one doctor's neglectful medical care even though he had been recommended for termination and had repeatedly failed to spot signs of heart trouble and would not send such patients to off-site hospitals. Rather, Wexford gave this doctor high marks and praise in his review.[50]

- In 2021, a prisoner committed suicide a few days after he was wrongfully taken off suicide watch and after four recent prior attempts, and the lawsuit filed by his family noted that Wexford's failure to adequately supervise and train its staff resulted in a marked increase in prison suicide rates since Wexford began providing care in Iowa prisons in 2017.[51]

84. Similarly, the extensive violations of proper protocol in Mr. Ayala's case provide compelling evidence that Wexford had a continuing, widespread pattern and practice of failing to adequately hire, retain, train, and supervise its personnel.

85. As such, Wexford's widespread failures to adequately hire, retain, train, and supervise its personnel were a primary cause of the constitutional violations suffered by Mr. Ayala.

---

[47] *Id.*
[48] https://www.clarionledger.com/story/news/politics/2017/02/08/epps-bribery-civil-lawsuit/97645586/
[49] https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400
[50] *Id.*
[51] https://www.indystar.com/story/news/investigations/2021/11/30/lawsuit-mentally-ill-man-should-not-have-died-indiana-prison/8797782002/

Each of Wexford's failures to conduct necessary examinations deprived Mr. Ayala of the opportunity to be evaluated, diagnosed, and to be prioritized in receiving the medical treatment that he so desperately needed. Because medical personnel were not adequately trained or supervised to ensure that the proper medical procedures were followed, Mr. Ayala never received the opportunity to obtain additional medical services until his medical condition had become life threatening. Consequently, he sustained the injuries that resulted in his extensive hospital stay and near-death experiences.

86.     Training and supervision regarding proper medical treatment protocol and documentation was required because, as Wexford knew to a moral certainty, Wexford's personnel would commonly confront situations where they would need to assess the severity and emergency nature of patients' medical conditions. This is among the primary tasks that these personnel were hired to do.

87.     Additionally, documenting and assessing the next steps in a patient's medical treatment is precisely the type of complex and important decision that requires training and supervision.

88.     As evinced by Mr. Ayala's situation and the others cited in this section of the Complaint, Wexford's widespread pattern of deficient hiring, retention, training, and supervision presents an obvious potential to violate patients' constitutional rights, because there has been a growing history where prisoners are denied serious medical care to which they are entitled, and they suffer from long-term disability or death as a result.

89.     Wexford and NMCD were alerted to an obvious deficiency in Wexford's hiring, retention, training, and supervision through the many prior lawsuits against it alleging

unconstitutional medical care. Wexford and NMCD were also put on notice of these deficiencies through the many news articles, cases, and reports from government agencies, court monitors, and former employees informing Wexford of the many ways that it fell short of providing constitutionally adequate medical care.

90.     One of the best examples illustrating each of the abovementioned patterns and practices, and Wexford's awareness of each of these practices, is the voluminous discovery conducted in *Sharon Bost v. Wexford et al.*, No. 15-CV-03278 (D. Md.) concerning the same patterns and practices as occurred in Mr. Ayala's case, which was filed on October 27, 2015 (ECF 1) and for which Wexford moved for summary judgment on September 8, 2021 (ECF 536). In her motion opposing summary judgment (ECF 543-1), Bost cited extensively from, and exhibited, 147 discovery documents, some of which are sealed, but which include: at least 11 expert reports (ECF 544, Nos. 48-50, 52-54, 107-108, 116-118), at least 33 deposition transcripts (ECF 544, Nos. 14-15, 17, 19-32, 34-39, 74, 98, 104, 119, 132, 134, 137, 140-42), at least 17 Continuous Quality Improvement ("CQI") reports (ECF 544, Nos. 6-7, 58, 61-70, 78, 143-45), and at least six Wexford Corrective Action Plans ("CAPs") (ECF 544, Nos. 8-13). All of the information discussed in the motion practice was obtained well before the events at issue in this case.

91.     Additionally, the discovery and reports produced in *Lippert et al. v. Ghosh et al.*, No. 10-CV-04603 (N.D. Ill.) put Wexford on notice of its widespread constitutional violations in providing prison medical care. Most significantly, the 45-page report published by a panel of court-appointed experts in December 2014 (ECF 339) outlined in detail how Illinois' healthcare program under Wexford was "unable to meet minimal constitutional standards" due to issues like: (1) unfilled and inadequate leadership positions, (2) the hiring of underqualified clinicians, (3) severe

understaffing, (4) inadequate clinic space, sanitation, and equipment, (5) insufficient supervision and facility oversight, (6) substantial delays in medically processing patients through the reception process, (7) disorganized, improper, and untimely medical records, (8) insufficient diagnosing and monitoring of patients' conditions, (9) arbitrary cancelation of prisoners' sick call requests, (10) a "cookie cutter" approach to chronic disease management, (11) "excessive" delays in off-site medical appointments, and (12) an "incomprehensible" failure to identify and respond to serious medical conditions, among other issues.

92.     Moreover, Defendant Dr. Murray Young admitted in a deposition for a similar matter that the nurses working within NMCD facilities, including GCCF, would not be able to identify endocarditis, yet they were, by Wexford's policy and practice, the gatekeepers who prevented prisoners like Mr. Ayala from receiving treatment for endocarditis. In his deposition, Defendant Young stated:

> Nurses aren't built to make a diagnosis like that. So that's not what—you know, the nurses aren't trained to make those diagnoses, which I think is what you're after. I'm not gonna throw my nurses under the bus. They do a good job. But they're not going to know, you can't possibly train a nurse to ferret out osteomyelitis and endocarditis when a patient has these issues. It's just not gonna happen.

93.     Wexford nurses in NMCD facilities lack the training and skills to identify possible endocarditis, yet, in accordance with Wexford's own policy and practice, they remain unsupervised by medical doctors to ensure that proper and timely diagnoses are made before prisoners' conditions become life-threatening. Rather, as in Mr. Ayala's case, the nurses simply repeatedly take vitals, declare the prisoners suitably healthy, state that nothing more can be done (other than possibly providing basic, over-the-counter pain medications and antibiotics), and send the prisoners back to their cells.

94.     Given the testimony of Defendant Young, it is not surprising that Wexford failed to report, diagnose, and treat emergent endocarditis and sepsis, as the nurses, who work without proper supervision by medical doctors, are not trained nor "built to" identify these life-threatening conditions.

95.     By the time that Mr. Ayala suffered at the hands of NMCD and Wexford, Wexford and NMCD were both well aware of each of the above unconstitutional patterns and practices, including Wexford's dire need to implement better hiring, retention, training, and supervision policies to prevent these rampant constitutional violations from continuing to occur.

96.     Wexford's extensive and longtime failures to provide adequate care are further evidence of its deliberate indifference to the constitutional violations caused by its widespread deficiencies in hiring, retention, training, and supervising. Likewise, NMCD evinced its deliberate indifference to these unconstitutional practices through its refusal to provide proper supervision and oversight of these practices despite the risk known to it.

IV.     **THE INDIVIDUAL WEXFORD AND NMCD DEFENDANTS HAD OVERSIGHT AUTHORITY OF WEXFORD'S MEDICAL SERVICES IN GCCF BUT ACTED WITH DELIBERATE INDIFFERENCE IN FAILING TO PERFORM ANY OVERSIGHT, THUS ALLOWING WEXFORD'S UNCONSTITUTIONAL PATTERNS AND PRACTICES TO CONTINUE AND CAUSING MR. AYALA'S INJURIES.**

97.     Upon information and belief, each of the Wexford and NMCD individual Defendants—Alisha Tafoya Lucero, David Selvage, Orion Stradford, Michael Hildenbrandt, Tommie Salinas, Dr. Murray Young, Kathy Armijo, James Gonzales, Arturo Leon, Sarah Cartwright, and Lynnsey Vigil—knew that there were a high number of endocarditis cases in NMCD prisons and did nothing to protect prisoners from worsening endocarditis, including Mr. Ayala.

98.     Upon information and belief, each of the Wexford and NMCD individual Defendants also knew of Mr. Ayala's persistent expressions of worsening pain, his debilitated physical appearance, and his eventual inability to walk. Likewise, each of the Wexford and NMCD individual Defendants knew that these symptoms posed a substantial risk of harm to Mr. Ayala, yet they did nothing to attempt to ameliorate that impending substantial harm, despite each having the authority and obligation to act to ameliorate that harm.

99.     These individual Defendants became aware of the above information through prior internal and legislative reports, news coverage, weekly and quarterly meetings/calls amongst each other and with other Wexford medical staff, quarterly tracking documents, quality assurance program reports, monthly continuous quality improvement meetings, statistical reports submitted to the Health Services Bureau, training materials, continuous quality improvement audits, American Correctional Association audits, National Commission on Correctional Healthcare audits, performance improvement reports, corrective action plans, prisoner grievances, health services request forms, and individual inmate files, including Mr. Ayala's file—a sampling of which is cited in Section III of this Complaint, *supra*.

100.     Any of the Wexford and NMCD individual Defendants could have interceded on behalf of Wexford and/or NMCD if any independent medical contractor did not appropriately care for any NMCD prisoner. Yet, none of the Wexford and NMCD individual Defendants interceded to protect Mr. Ayala from the deliberate indifference of Wexford medical staff.

101.     As the New Mexico Secretary for the Department of Corrections, Defendant Alisha Tafoya Lucero is and was responsible for managing "all operations of the department and . . . administer[ing] and enforce[ing] the laws with which [s]he or the department is charged." N.M.

Stat. Ann. § 9-3-5(A). Defendant Lucero was also required to exercise general supervisory power over all department employees and take administrative action by issuing orders to assure compliance with the law. *See id.* §§ 9-3-5(B)(1), (5); *see also Anchondo v. Corr. Dep't*, 100 N.M. 108, 109 (N.M. 1983) (describing the statutory duties of the secretary of corrections). Additionally, Defendant Lucero was required to "provide courses of instruction and practical training for employees of the department." N.M. Stat. Ann. § 9-3-5(B)(7). Defendant Lucero failed to exercise any of these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

102.    According to NMCD's own website, as the NMCD Health Services Administrator, Defendant David Selvage is and was responsible for ensuring that the health care in NMCD prisons "meets correctional healthcare standards and constitutional mandates." Defendant Selvage failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

103.    According to NMCD's website, as the NMCD Bureau Chief, Orion Stradford is and was "responsible for providing clear, concise executive direction while monitoring and auditing," with a focus on "private prison contract compliance, American Correctional Association compliance, quality assurance and conditions of confinement for the incarcerated." He and his Bureau are "also responsible for NMCD policy revisions and other compliance efforts related to the prevention of major prison litigation." Defendant Stradford failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or

custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

104.    As Wexford's Director of Operations, Defendant Michael Hildenbrandt was responsible for ensuring that Wexford was meeting the terms of the PSC, which required compliance with constitutional medical standards. Defendant Hildenbrandt failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

105.    According to Wexford's own human resources documents, as Wexford's Health Services Administrator for GCCF, Defendant Tommie Salinas was "responsible for effectively and efficiently managing the institution's overall health care delivery system and monitoring all health service contract activities," including supervising scheduling patients for outside appointments, reviewing hospital specialty referrals, and monitoring overall performance. Defendant Salinas failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

106.    According to Wexford's human resources documents, as Wexford's Regional Medical Director, Defendant Dr. Murray Young was responsible for "clinical supervision." Defendant Young failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

107.    According to Wexford's human resources documents, as Wexford's Regional

Manager of GCCF, Defendant Kathy Armijo was responsible for supervising Defendant Salinas, Wexford's HSA, to ensure that he was adequately performing his job responsibilities. Defendant Armijo failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

108.   According to Wexford's human resources documents, as Wexford's Medical Directors of GCCF, Defendant James Gonzales and Defendant Arturo Leon were both responsible for reviewing hospital specialty referrals, ensuring that hospital specialty referrals were appropriately made, and overseeing interactions with medical specialists. Additionally, Defendants Gonzales and Leon were tasked with providing clinical supervision at GCCF. Defendants Gonzales and Leon failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

109.   According to Wexford's human resources documents, as Wexford's Regional Director of Nursing, Defendant Sarah Cartwright was responsible for clinical supervision of nurses at GCCF and oversight of "the nursing process of assessment, planning, implementation, and evaluation." Defendant Cartwright was also responsible for reviewing and monitoring all prisoners receiving medications and "mak[ing] referrals to the appropriate health care provider in a timely manner based on diagnostic tests, labs, and nursing diagnosis." Defendant Cartwright failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained

medical staff who inadequately refer prisoners for outside care.

110.    As Wexford's Utilization Management Coordinator, Defendant Lynnsey Vigil was responsible for ensuring an effective and constitutionally adequate process by which referrals to outside medical providers were made and approved. Defendant Vigil failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

111.    Although their supervisory roles empowered them to do so, none of the Wexford or NMCD individual Defendants provided training to correctional staff or medical staff on the symptoms of endocarditis or sepsis. None of the Wexford or NMCD individual Defendants established reporting requirements for staff when deadly infections such as endocarditis and sepsis are apparent. And none of the Wexford or NMCD individual Defendants took any step to revise the policies or practices by which inadequately trained medical staff were responsible for diagnosing prisoners and acted as gatekeepers, effectively causing GCCF prisoners to be denied all medical care for endocarditis, sepsis, and similar infections such as osteomyelitis.

112.    The Wexford medical staff at GCCF referenced above were clearly inadequately trained, and each of the Wexford and NMCD individual Defendants were responsible for ensuring that these staff were adequately trained to prevent the type of injuries and constitutional violations suffered by Mr. Ayala. Specifically, each of the Wexford and NMCD individual Defendants were responsible for ensuring that Wexford did not perpetuate a policy or practice where prisoners were forced to resort to describing their medical problems to staff who were unqualified to diagnose illnesses like endocarditis or to identify such conditions and make the appropriate referrals.

113.    The Wexford and NMCD individual Defendants knowingly endorsed and perpetuated a policy where prisoners at GCCF were unable to make their medical problems known to staff, because the Wexford medical staff were not competent to diagnose illnesses to then refer prisoner patients to proper medical providers to treat those conditions. In this way, GCCF prisoners were denied access to appropriately qualified health care personnel for serious, life-threatening conditions—and this knowing denial evinces the deliberate indifference of the Wexford and NMCD individual Defendants.

114.    Consequently, each of the individual Defendants is liable according to claims of direct supervisory liability.

115.    The Wexford medical staff referenced above were each subordinates of the individual Wexford and NMCD Defendants named in the Complaint, as these staff members were agents of both Wexford and NMCD, and the individual Defendants each have supervisory authority over them. As such, the constitutional violations of Wexford medical staff properly serve as the basis for each of the Wexford and NMCD Defendants' supervisory liability.

116.    Through their failures to act despite having the duty and authority to do so, each of the Wexford and NMCD individual defendants personally implemented, utilized, and promulgated Wexford's unconstitutional practices and policies, as further outlined in Section III of this Complaint, *supra*.

117.    Overall, each of the Wexford and NMCD individual Defendants maintained policies or customs of (a) failing to medically train prison employees responsible for diagnosing and treating prisoners, (b) delaying medical care, and (c) keeping poor records. As a result, Mr. Ayala's infection was allowed to become uncontrollable until he suffered from multiorgan failure

and nearly died.

118.     The harm to Mr. Ayala could have been avoided if he had received a simple referral and had supervisory Defendants approved the referral to an outside specialist for proper diagnosis and treatment. Additionally, the harm to Mr. Ayala could have been avoided with proper reporting by NMCD and/or Wexford personnel when it was clear that he was not receiving proper medical care and thus deteriorating rapidly.

## V.     DAMAGES SOUGHT

119.     As a direct result of Defendants' unlawful conduct, Mr. Ayala endured tremendous pain, injuries, anguish, and suffering, which entitles him to general and special compensatory damages.

120.     Further, Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, in addition to pre-judgment interest and costs as allowed by federal law.

121.     Plaintiff is also entitled to punitive damages against each of the Defendants, as their actions were done with malice or, minimally, with reckless indifference to Mr. Ayala's federally protected rights.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
**8th and 14th Amendments to the U.S. Constitution**
**Deliberate Indifference to Serious Medical Need (42 U.S.C. § 1983)**
**(against Wexford, Alisha Tafoya Lucero, David Selvage, Orion Stradford, Michael Hildenbrandt, Tommie Salinas, Dr. Murray Young, Kathy Armijo, James Gonzales, Arturo Leon, Sarah Cartwright, and Lynnsey Vigil in their individual capacities)**

122.     Each paragraph of this Complaint is incorporated as if fully restated herein.

123.     The abovenamed Defendants each possessed responsibility for the decisions that resulted in the violation of Mr. Ayala's constitutional right to be free from cruel and unusual

punishment regarding the deliberate indifference to his serious medical needs while in NMCD custody, as described more fully above.

124.    These Defendants were aware of and deliberately disregarded the substantial risk of harm to Mr. Ayala that would ensue because of their failures to provide him with constitutionally adequate medical care, as described more fully above.

125.    Notably, each of the abovenamed Defendants was aware of Mr. Ayala's severe and escalating pain, yet took essentially no action to address this anguish, which constitutes deliberate indifference to his pain and deteriorating medical condition.

126.    The deliberate indifference of the abovenamed Defendants caused Mr. Ayala to experience worsening severe, prolonged and unnecessary pain (first harm), to develop severe endocarditis (second harm), and to suffer from a delayed diagnosis of severe endocarditis (third harm), which ultimately caused multiorgan failure and required emergency surgeries due to the severity.

127.    Mr. Ayala's harms were sufficiently serious injuries that a reasonable doctor or patient would find them important and worthy of immediate treatment. Without treatment, Mr. Ayala's worsening severe pain caused him to lose the ability to take care of his most basic needs and restricted him to a wheelchair at times. Without emergency surgeries, Mr. Ayala's severe endocarditis would have caused him to die.

128.    Moreover, Mr. Ayala's severe pain and endocarditis significantly affected his daily activities, as he lost the ability to care for even his most basic needs and struggled through pain while completing basic tasks like standing up, walking, and lying down.

129.    The abovenamed Defendants are not shielded by qualified immunity for their

deliberate indifference to Mr. Ayala's serious medical needs because of the well-documented 10th Circuit precedent notifying medical and prison personnel that the Eighth Amendment is violated when such personnel fail to take reasonable measures to provide a patient with access to medical attention and/or deny medical care to a patient with serious medical needs, as occurred in Mr. Ayala's case with each of the Defendants named herein.

**SECOND CLAIM FOR RELIEF:**
**8th and 14th Amendments to the U.S. Constitution**
**Policy & Practice of Denial of Medical Care (42 U.S.C. § 1983)**
**(against Wexford)**

130.    Each paragraph of this Complaint is incorporated as if fully restated herein.

131.    As a private corporation acting pursuant to its agreement with NMCD to provide medical services to New Mexico State prisoners, Wexford was at all times relevant to the events described in this Complaint acting under color of law and, as the provider of healthcare services to prisoners incarcerated at GCCF, was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by employees and agents of Wexford and GCCF/NMCD.

132.    Mr. Ayala's injuries were proximately caused by Wexford's policies and practices.

133.    Wexford maintains a policy, practice, and custom of under-reporting the severity of medical and mental health emergencies and denying appropriate medical and mental health care to prisoners. On information and belief, Wexford medical staff working in NMCD facilities lack the necessary medical backgrounds to provide adequate care and are trained to ignore or under-report symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Ayala.

134.     On information and belief, Wexford supervises its employees to ignore or under-report symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Ayala.

135.     On information and belief, Wexford ratifies the conduct of its employees who ignore or under-report symptoms of medical and mental health emergencies through review and approval of these employees' performance, and through the decision to continue the employment of such individuals who ignore and under-report medical and mental health emergencies of NMCD prisoners, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Ayala.

136.     At all times relevant to this Complaint, Wexford and NMCD had notice of a widespread practice by their employees and agents at GCCF and other NMCD facilities under which prisoners with serious medical conditions, including Mr. Ayala, were routinely denied access to proper or sufficient medication and medical attention. Upon information and belief, it was common to observe prisoners of GCCF and NMCD with clear symptoms of serious medical and/or mental concerns whose requests for medical care were routinely denied or completely ignored. Upon information and belief, a significant portion of these denials of medical and mental health care resulted in substantial injury or death.

137.     More specifically, there was a widespread practice under which employees and agents of Wexford and NMCD, including correctional officers and medical personnel, failed or refused to: (1) report, diagnose, and properly examine, monitor, and treat prisoners with serious medical and/or mental health conditions, including failing to provide proper medications to

prisoners with serious medical and/or mental health conditions; (2) respond to prisoners who requested medical and/or mental health services; (3) respond to prisoners who exhibited clear signs of medical and/or mental health need or illness; (4) adequately document and communicate the medical and mental health needs of prisoners to the appropriate correctional officers and/or medical or mental health staff; or (5) timely refer prisoners for emergency or other offsite medical services.

138.    Additionally, there was a widespread practice under which Wexford personnel severely understaffed its medical and mental health facilities and failed adequately to train and supervise its personnel on necessary medical and mental health procedures.

139.    These widespread practices were allowed to proliferate because Wexford and NMCD directly encouraged, and were the moving forces behind, the specific misconduct at issue. Wexford and NMCD also failed to adequately hire, retain, train, supervise, and control correctional officers and medical personnel by failing to adequately punish and discipline prior instances of similar misconduct, thereby directly encouraging future abuses like those which harmed Mr. Ayala.

140.    Wexford and NMCD knew of the substantial risk of serious or fatal consequences that could be caused by their unconstitutional policies, practices, customs, failures to train, and failures to supervise, hire, and retain appropriately credentialed staff, as occurred in Mr. Ayala's case. However, they intentionally continued to perpetuate these unconstitutional policies and practices despite the known risks.

141.    These policies and conduct were the moving force behind the violations of Mr. Ayala's constitutional rights and his injuries. Mr. Ayala's injuries were caused by employees and

contractors of NMCD and Wexford, including but not limited to the individually-named Defendants, who acted pursuant to the unconstitutional policies and practices of NMCD and Wexford while engaging in the misconduct described in this Complaint.

142.    Upon information and belief, Wexford maintained these policies and practices in order to maximize profit and without regard to its constitutional and medical obligations to NMCD prisoners who were entrusted to Wexford's care.

143.    Wexford and the Wexford individual Defendants are not shielded by qualified immunity for their unconstitutional policies and practices, because private companies and their private employees are never entitled to qualified immunity, even when employed doing correctional work. *See, e.g., Phillips v. Tiona*, 508 Fed. Appx. 737, 751-52 (10th Cir. 2013).

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief against Defendants, jointly and severally:

(a)    Monetary damages against Wexford and individual Defendants sued under 42 U.S.C. § 1983 in their individual capacities in an amount to be determined at trial to compensate Plaintiff for the injuries he sustained as a result of the events and conduct alleged herein;

(b)    Punitive damages against all Defendants in an amount to be determined at trial;

(c)    Statutory interest on any and all damages awarded to Plaintiff;

(d)    Reasonable attorneys' fees and costs under 42 U.S.C. §§ 1988; and

(e)    Such other and further relief as the Court may deem just and proper, including injunctive and declaratory relief.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b)

on all issues in this case so triable.


Dated: Albuquerque, New Mexico      Respectfully submitted,
      February 4, 2024

PRISON LIGHTS, INC.

*/s/ Elise C. Funke*
Elise C. Funke
407 Seventh Street NW
Albuquerque, NM  87102
(505) 600-2392
elise@prisonlights.org

-and-

COLLINS & COLLINS, P.C.
Parrish Collins
P.O. Box 506
Albuquerque, NM 87103
(505) 242-5958
parrish@collinsattorneys.com

-and-

GUEBERT GENTILE & PIAZZA P.C.
Terry R. Guebert
Robert F. Gentile
Elizabeth M. Piazza
P.O. Box 93880
Albuquerque, NM 87199
(505) 823-2300
tguebert@guebertlaw.com
rgentile@guebertlaw.com
epiazza@guebertlaw.com

*Attorneys for Plaintiff*